BURWELL IRRIGATION COMPANY V. WILLIAM D.
LASHMETT.

FILED JANUARY 24, 1900.   No. 9,094.

1. **Work and Labor: PLEADING.** A petition for the recovery, *quantum
   meruit*, for work and labor performed by the plaintiff for defend-
   ant, examined, and *held* to state a cause of action.

2. **Conflicting Evidence: REVIEW.** Where the evidence is conflicting
   and the judgment is supported by competent evidence, it will
   not be disturbed, even though a different conclusion might have
   been reached.

3. **Estoppel: PLEADING.** An estoppel, to be available as a cause of
   action or defense, must be specially pleaded.

ERROR from the district court of Garfield county.
Tried below before KENDALL, J.   *Affirmed.*

*Charles A. Munn* and *Guy Laverty*, for plaintiff in error.

*A. M. Robbins* and *C. I. Bragg, contra.*

HOLCOMB, J.

This action was begun in the lower court for a re-
covery, *quantum meruit*, for labor alleged to have been
performed by defendant in error for plaintiff in error in
the construction of an irrigation ditch. A jury was
waived, and trial had to the court, which resulted in
favor of the plaintiff below. Defendant brings the case
here for review.

While several errors are assigned as ground for re-
versal, but two are argued in brief of counsel, and they
only will be considered in determining the cause. It is
urged that the petition does not state facts sufficient to
constitute a cause of action, and that the finding of the
trial court is not sustained by any competent evidence.
The petition, in substance, alleges that the defendant is
a corporation organized under the laws of the state of
Nebraska; that during the month of November, A. D.

1894, the plaintiff had some conversation with one J. M. Morris in regard to work on an irrigation ditch then about to be dug by the defendants, and that on or about the 21st day of November, A. D. 1894, one James Wilson, who was then the engineer and in charge of the construction and excavation of said ditch, inquired of plaintiff if he would go to work on said ditch at once; that plaintiff replied that he would go to work on the following day with quite a force of men and teams, and that he, Wilson, then directed plaintiff where to commence work, and told plaintiff it was necessary he should get to work on the next day in order to save certain water rights of the company; that plaintiff then supposed he was going to work for the said J. M. Morris, and was not advised to the contrary until long afterwards, and alleges that said Morris had no contract on said ditch, but was employed by the defendant as its foreman; that plaintiff and the men under him worked nine and one-half days, and that the value of the work and labor was $194.87; that payment and deductions to the amount of $8.62 had been made, leaving still due for said work and labor the full sum of $186.25, and that afterwards, and on the 15th day of December, 1894, the said Morris, while in the employ of the said defendant, made and delivered to plaintiff a "time check," as follows:

"No. 6.                BURWELL, NEBRASKA, Dec. 15, 1894.

"Burwell Irrigation Co., to J. M. Morris, Contractor. The bearer, Dug Lashmett, worked to the amount of $186.25 on the Burwell ditch, in full.

"Payable the 15th and 30th of each month.

                                "J. M. MORRIS, *Foreman.*"

That afterwards, and on the 15th day of December, 1894, he presented said time check to the said defendants, and said defendants then and there agreed to pay the same on the 15th day of the next month, saying that it could not then pay the same, because no estimate had been made on said work; that afterwards, on the 15th

day of January, 1895, and at other times, the time check was presented for payment, which was then and there refused, and that there is now due from the defendant to this plaintiff, on account of the work done and performed, over and above all just credits, the full sum of $186.25, for which, with interest, judgment is prayed. In construing the petition, for the purpose of determining its sufficiency, it is only necessary to ascertain whether it contains sufficient material allegations to state a cause of action against the defendant. It is the spirit of modern law to look to the substance rather than to the form of a pleading. If its form or manner of construction is objectionable because of indefiniteness or faulty arrangement, such defect may be reached by a proper motion. It is not for this court to hold the petition bad because it may not be a model in construction or artistic in arrangement. It is provided by the Civil Code that the petition shall contain a statement of the facts constituting the cause of action in ordinary and concise language, without repetition. As we analyze the petition under consideration, it states that the plaintiff was employed by one Morris, acting as the foreman of the defendant, to perform the labor mentioned in his petition; that the engineer in charge of the construction of the ditch also procured him to begin work, and directed where the same should be done; that at the time he supposed he was working for Morris as contractor, but later ascertained that Morris had no contract, and that he was in fact acting as foreman for said company in the construction of its ditch, and that plaintiff performed the work for the company, and not for Morris as contractor, and that as foreman he gave plaintiff a "time check," or a statement of the amount due for work performed, which was accepted by the company, and payment thereof agreed to be made on the 15th day of the month following; that the work was reasonably worth the amount stated; that it was due from defendant to plaintiff, followed by a suitable prayer for relief. Entertaining, as we do, this view

as to a proper construction of the averments in the peti-
tion, it is evident that a cause of action is stated therein,
and that the objection thereto is not well taken. In
*Tessier v. Reed,* 17 Nebr., 105, it is held that a petition
which alleges that the defendant is indebted to the plain-
tiff for a specific sum then due and payable for goods,
wares, and merchandise sold and delivered by the plain-
tiff, states a cause of action. Applying the rule quoted
to the case at bar, it may be said the petition herein al-
leges that the defendant is indebted to the plaintiff for
the sum mentioned, which is the reasonable value for
work and labor done and performed for the defendant
by the plaintiff at its instance and request, through its
foreman and engineer in charge, and, therefore, states a
good cause of action. See, also, *Rathburn v. Burlington &
M. R. Co.,* 16 Nebr., 441.

It is urged by counsel for plaintiff in error "that the
court erred in finding in favor of the plaintiff and against
the defendant, because said finding is not sustained by
any competent evidence." The defendant, in its answer,
avers that the services, which form the basis of plain-
tiff's action, were performed for J. M. Morris, and not
for the defendant; that Morris had a contract with the
defendant for excavating certain parts of its ditch at a
stipulated price per yard; that said contract was after-
wards abandoned, and full settlement made with Morris
therefor; that said Morris was never its foreman, and
was never in its employ except under said contract. It
is thus made to appear that the only issue is in regard
to the party for whom the services were rendered. There
is no controversy as to the rendition of the services or
the value thereof, or that the labor was performed in
the construction of the ditch belonging to the defendant.
The evidence is conflicting, and from it different conclu-
sions may be reached, according to the credibility of the
different witnesses and the relative importance attached
to different portions of the testimony. The plaintiff tes-
tifies that he did the work under the direction of Morris

and the engineer in charge; that at the time he supposed Morris had a contract with the defendant company, and that he was working for Morris, but subsequently learned that Morris had no contract, and that the work was being done for the company; that at the time he settled for his work, he was given a "time check" by Morris as foreman, and presented the same to the company, and that payment was promised in thirty days, and that no objection was made to the order or "time check" by the officers of the company. The Morris mentioned in the pleadings was a witness, and testified relative to the matter in dispute as follows:

"Q. You may state, Mr. Morris, if, pending negotiations for this work of excavating defendant's ditches, you had had any conversations with the plaintiff, William D. Lashmett, in regard to working on that ditch under you.

"A. Yes, sir.

"Q. Had you completed your contract with him? That is the price?

"A. No, sir. I had not.

"Q. You may state, Mr. Morris, whether you sent Mr. Lashmett, the plaintiff, to work on the ditch.

"A. I did not.

"Q. You may state, if you know of your own personal knowledge, who did send him to work, if you know from him or any of the defendants.

"A. Yes, sir. I know from him and the defendants both.

"Q. You may state what you learned in regard to his employment from the defendants.

"A. Why, the defendants told me they put him to work. I afterwards put him to work in a certain section, I forget the number of it. He worked about a day and a half for me there. When I came up there the defendant told me he put him to work.

"Q. He told you he had put him to work?

"A. Yes, sir.

43

"Q. Which one of the defendants was it you had this conversation with?

"A. Wilson."

Wilson was the engineer in charge of the work. After testifying as to the abandonment of the contract under negotiations between the witness and the company, the witness further testifies as follows:

"Q. What was said in regard to their paying the men that were engaged in doing the work and the manner that was to be done?

"A. Well, he just said, we will have to make arrangements to get money and pay them.

"Q. Was anything said in regard to your giving time checks to the men as though they were still in your employ and what was to be done with them?

"A. Well, I tried to have some kind of permanent settlement with them in regard to what should be done, and there was a certain piece of work that I was not to have any account of, but I was to pay for that. I had this man Lashmett do it, and I paid him. I was told to go ahead and give time checks and gave lots of them. Some were for 3, 4, and 10 dollars, some were as high as $20 and $25. They were taken up and they gave their time checks in place and they paid in that way.

"Q. Now you say there was a small part of the work which Lashmett the plaintiff did, that you was to settle for?

"A. There was a small part that had never been finished and I had Mr. Lashmett do, he put in only a short time, a day and a half or such a matter and I gave him feed for the same. I had him work with a new machine.

"Q. You may state if you gave Mr. Lashmett a time check for the work he had done.

"A. I did.

"Q. You may state if this time check, as you call it, was given on your own behalf, or on behalf of the irrigation company.

"A. I gave it to the irrigation company, the same as all others; signed it as foreman."

The officers of the company testify that a contract was entered into between the company and Morris for the excavation of the ditch at a stipulated price per yard, and that the work done by the plaintiff was for Morris as contractor under his said contract. It also appears that the contract, soon after it was agreed upon, was abandoned by both parties thereto, and, by the consent of both, burned up. It is established by the evidence that, as a part of the contract which was being negotiated with Morris, a construction bond was to be given by him, which was never done, and the failure of which was one of the causes which led to its abandonment.

It is quite apparent, from a consideration of all the evidence bearing upon the question, that the contract was never, in fact, consummated. As a part of the contract, the construction bond mentioned was to be given, which was never done; and part payment, under its terms, was to be made in the securities of the company, and this was not acted upon or sought to be carried out by either of the parties. Whether the contract, as far as it had been consummated, was delivered, in a legal sense, is in doubt. The testimony all goes to show that the company never recognized Morris as a contractor, and made all payments for work, pending the consummation of the contract until its abandonment, direct to the persons rendering the services, and upon orders by Morris as foreman, similar to the one given to the plaintiff herein. It may fairly be concluded from the evidence that the arrangement between Morris and the company, during the time the contract was held awaiting the giving of the construction bond and before its abandonment, was of a temporary character, the company retaining control of the work and directing its prosecution until the contract with Morris was completed, intending to relinquish their control and supervision of the work to him when the contract had been fully executed.

The secretary of the company gave the following testimony:

"Q. Wasn't there thirty or forty or fifty of those checks issued by Mr. Morris?

"A. Possibly there was.

"Q. And were honored by the company.

"A. Yes, sir.

"Q. And as far as you know there was no objection to that form—no objection to his signing as foreman as far as you know?

"A. Not at a certain time there was not. I don't think there was.

"Q. During the time and up to the time you made the settlement with him, there wasn't any objection?

"A. I don't think there was.

"Q. Then the basis of the settlement was that you was to take the work, and pay for the work, and he was to turn over these tools, that is he was to turn over the use of the tools?

"A. Yes, sir.

"Q. And that made the settlement?

"A. Yes, sir.

"Q. And that was all there was to it?

"A. That was right.

"Q. That was all there was to it?

"A. Certainly."

The president testifies as follows:

"Q. State to the court what you know about it. [The contract.]

"A. There was a contract made with J. M. Morris for to excavate the canal from the head to the foot of it for so much per yard. He made the contract and the contract was made and signed by the company and J. M. Morris on condition that he had a bond signed for security to the company. The bond never was signed.

"Q. Mr. Brownell, I believe you say that all of the contracts that had been let by Morris, subcontracts that had been let by Morris, were in that settlement, assigned over to the company, the Burwell Irrigation Company, except the one that he was to work on himself?

"A. They may not have been in that settlement, but they were assigned over. The company assumed the contracts, all of them, with that exception, and that was no contract at all. He was simply working there by days work."

Wilson, the engineer, testifies as follows:

"Q. Do you know what terminated it?  [The contract.]

"A. The failure of Morris to comply with the terms of his agreement and give a bond acceptable to the company.

"Q. Yes, and in regard to it.  What became of it?

"A. I requested Mr. Morris to see if he could not get other bondsmen and proceed on the work on the contract, and he protested that he couldn't, that it would be impossible for him to do so and I told him that it would be advisable for him to try to keep the thing quiet for a day or two until he could ascertain whether he could get bondsmen or not, and I urged him to go ahead with the contract, because it was a remarkably good contract for the company, and being interested in the company I wanted the contract carried out.  He made no effort and was very anxious to cancel the contract.  I told him that the matter would have to be submitted to the board of directors and myself and Mr. John Doran were appointed a committee to make a settlement with Mr. Morris."

It is disclosed by the testimony that Morris was never paid any sum under his alleged contract, except possibly such sums as were paid directly to the persons performing the services, and that all such were paid except the plaintiff in this action.  Much of the testimony bears on the question as to whether the plaintiff had said he would release the company, and look to Morris for compensation.  When the contract with Morris was abandoned, it appears that more or less was said as to amounts owing for work prior to that time, and the amount due plaintiff received some attention, defendant insisting that plaintiff at that time agreed to release the company from liability and look to Morris.  Whatever may be the

truth, there was no agreement founded upon any valid consideration. This is recognized by the defendant, who urges that the alleged agreement operates as an estoppel, and, therefore, precludes a recovery in this action. This evidence, if valuable for any purpose, discloses that the defendant was conscious of its liability for the labor performed by the plaintiff, and sought in this manner to relieve itself of responsibility. While it is urged that the alleged agreement to release the company estops the plaintiff from recovery in this action, it need but be stated that no estoppel is pleaded, and this contention is now unavailing. See *Nebraska Mortgage Loan Co. v. Van Kloster*, 42 Nebr., 749. Where the evidence is conflicting, and the judgment is supported by competent evidence, as we think it is in this case, under the uniform decisions of this court it should not be disturbed, though a different conclusion might have been reached. See *Hunt v. Huffman*, 41 Nebr., 244; *Ripley v. Larsen*, 43 Nebr., 687; *Blodgett v. McMurtry*, 34 Nebr., 782.

From the foregoing it is apparent that the judgment of the trial court should remain undisturbed, and the same is accordingly

AFFIRMED.